**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.:  _____

GOVERNMENT EMPLOYEES INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL INSURANCE
COMPANY, and GEICO CASUALTY CO.,

     Plaintiffs,                                                              **Jury Trial Demand**

vs.

BARRY N. BURAK, D.C. and AFFILIATED HEALTHCARE
CENTERS, INC.,

     Defendants.

_____/

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue

Defendants and allege as follows:

1.     This action seeks to recover more than $6,000,000.00 that Defendants wrongfully

obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault",

"personal injury protection", or "PIP") insurance charges through Defendant Affiliated Healthcare

Centers, Inc. ("Affiliated Healthcare"), relating to medically unnecessary, illusory, unlawful, and

otherwise non-reimbursable health care services and goods, including purported examinations,

physical therapy services, chiropractic services, range of motion testing, muscle strength testing,

electrodiagnostic testing, diagnostic imaging, platelet-rich plasma ("PRP") injections, pain

management injections and procedures, and arthroscopic surgeries (collectively the "Fraudulent

Services"), that purportedly were provided to Florida automobile accident victims ("Insureds") who were eligible for coverage under GEICO no-fault insurance policies.

2.      In particular, and as set forth in greater detail below, the Defendants: (i) unlawfully operated Affiliated Healthcare without a Florida health care clinic license or a licensed physician on staff as medical director, despite the fact that Affiliated Healthcare did not qualify for any valid exemption to the Florida health care clinic licensing and medical director requirements; (ii) unlawfully billed for "physical therapy" services performed by massage therapists, despite the fact that massage therapists may not lawfully perform physical therapy services, and in any case health care providers in Florida may not receive PIP reimbursement for services performed by massage therapists; (iii) unlawfully failed to make any good faith efforts to collect co-payments or deductibles from their patients; and (iv) misrepresented the nature, extent, results, and medical necessity of the Fraudulent Services, and whether they were entitled to PIP reimbursement in the first instance.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending, fraudulent and unlawful PIP claims that Defendants have submitted through Affiliated Healthcare, because:

(i)      the Defendants operated in pervasive violation of Florida healthcare laws and regulations, including: (a) the licensing and operating requirements set forth in the Florida Health Care Clinic Act, Fla. Stat. § 400.990 et seq. (the "Clinic Act"); (b) Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims statute"); and (c) Fla. Stat. § 486.011-486.172 ("the Physical Therapy Act"), thereby rendering them ineligible to collect PIP insurance benefits in the first instance, and rendering their PIP insurance charges noncompensable and unenforceable;

(ii)     the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

2

(iii)    in many cases, the Fraudulent Services never were legitimately provided in the first instance;

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently and unlawfully inflate the charges submitted to GEICO; and

(v)    virtually all of the purported physical therapy services billed through Affiliated Healthcare to GEICO were performed by massage therapists, and therefore are ineligible for PIP insurance reimbursement.

4.    The Defendants are as follows:

(i)    Defendant Barry N. Burak, D.C. ("Burak") is licensed as a chiropractor in Florida. Burak owned and controlled Affiliated Healthcare and used Affiliated Healthcare as a vehicle to submit fraudulent and unlawful billing for the Fraudulent Services to GEICO and other insurers.

(ii)    Affiliated Healthcare is a Florida health care practice that falsely purported to be exempt from the Clinic Act's clinic licensing and medical director requirements, operated in pervasive violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act, and was used by Burak as a vehicle to submit fraudulent and unlawful PIP billing to GEICO and other insurers.

5.    As set forth below, the Defendants have known that:

(i)    Affiliated Healthcare operated in pervasive violation of Florida law, including: (a) the licensing and operating requirements set forth in the Clinic Act; (b) the False and Fraudulent Insurance Claims statute; and (c) the Physical Therapy Act, thereby rendering it ineligible to collect PIP insurance benefits in the first instance, and rendering its PIP insurance charges noncompensable and unenforceable;

(ii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iii)    in many cases, the Fraudulent Services never were legitimately performed in the first instance;

(iv)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO; and

(vi)   virtually all of the purported physical therapy services billed through Affiliated Healthcare to GEICO were performed by massage therapists, and therefore are ineligible for PIP insurance reimbursement in the first instance.

6.      As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO.

7.      The chart annexed hereto as Exhibit "1" sets forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that have been submitted through Affiliated Healthcare to GEICO by mail.

8.      The Defendants' fraudulent and unlawful scheme began no later than 2018, and has continued uninterrupted since that time. As a result of Defendants' fraudulent and unlawful scheme, GEICO has incurred damages of more than $6,000,000.00.

## THE PARTIES

### I.   Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.   Defendants

10.     Defendant Burak resides in and is a citizen of Florida. Burak was licensed to practice chiropractic in Florida on October 24, 1978, but never has been licensed as a physician. Burak owned and controlled Affiliated Healthcare, falsely purported to supervise the business activities at Affiliated Healthcare, and used Affiliated Healthcare as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

11.     Defendant Affiliated Healthcare is a Florida corporation with its principal place of business in Florida. Affiliated Healthcare was incorporated in Florida on February 24, 1997, had Burak as its owner and president, falsely purported to be exempt from the Clinic Act's licensing and medical director requirements, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

## III.   Other Relevant Individuals

12.     Although GEICO has not named them as Defendants in this case, Ingrid Bernuy ("Bernuy"), Kirstie Kennady ("Kennady"), and Marla Montesinos ("Montesinos")(collectively the "Massage Therapists") are relevant to understanding Plaintiffs' claims in this action.

13.     The Massage Therapists are licensed in Florida as massage therapists, and routinely purported to provide "physical therapy" services at Affiliated Healthcare, which then were billed to GEICO.

14.     Upon information and belief based on a review of Florida Department of Health records, other than being licensed massage therapists, the Massage Therapists are not licensed to practice any other health care profession.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

16.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.     Brief Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

### A.     The Florida No-Fault Law

18.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Florida Motor Vehicle No-Fault Law (the "No-Fault Law", Fla. Stat. §§ 627.730-627.7405), which requires automobile insurers to provide Personal Injury Protection benefits ("PIP Benefits") to Insureds.

19.     Under the No-Fault Law, an Insured can assign his or her right to PIP Benefits to health care services providers in exchange for those services. See Fla. Stat. § 627.736. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form"). See id.

### B.     No-Fault Reimbursement and Compliance with Florida Law Governing Health Care Practice

20.     In order for a health care service to be eligible for PIP reimbursement, it must be "lawfully" provided. See Fla. Stat. § 627.736.

21.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment." See Fla. Stat. § 627.732.

22.     Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment – including, among other things, the Clinic Act, the Physical Therapy Act, and the False and Fraudulent Insurance Claims statute.

23.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

24.     Under the False and Fraudulent Insurance Claims statute, it is unlawful for a health care provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments or deductibles from PIP patients. See Fla. Stat. § 817.234(7).

25.     Failure to make a good-faith effort to collect co-payments or deductibles renders the PIP charges submitted by a health care provider unlawful and noncompensable.

26.     Subject to certain limited exceptions, a license issued by the Florida Agency for Health Care Administration is required in order to operate a "clinic" in Florida. See Fla. Stat. § 400.991(1)(a). The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider." See Fla. Stat. § 400.9905.

27.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

> A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license … .

Fla. Stat. § 400.9905(4)(g)(emphasis added).

28.     Therefore, in order for a health care practice to qualify for this "wholly owned" exemption under the Clinic Act, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to legitimately supervise the business activities of the clinic and remain legally responsible for the clinic's compliance with all federal and state laws, and the practice cannot provide health care services that are beyond the scope of the practitioner-owner's license.

29.     A clinic that does not qualify for the wholly owned exemption, and does not otherwise have a license, operates unlawfully under Florida law, and is ineligible to collect PIP Benefits.

30.     Unless it is operating pursuant to an exemption from the clinic licensing requirements, a clinic operating in Florida not only must obtain a clinic license, but must "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic." See Fla. Stat. § 400.9935(1).

31.     Among other things, a clinic medical director must be a licensed physician, and must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent

8

or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action." See Fla. Stat. § 400.9935(1).

32.    In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license", and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided." See Fla. Stat. § 400.9935(1).

33.    Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014." See Fla. Stat. § 400.9935(3).

34.    Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

35.    By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements, whether or not the underlying health care services were medically necessary or actually provided.

C.   **No-Fault Reimbursement, Massage Therapy, Massage Therapists, and Physical Therapy**

36.    Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics licensed under the Clinic Act, to collect PIP Benefits for massage therapy, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed" by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting. See 2012 Fla. ALS 197.

37.    However, the No-Fault Law was amended, effective January 1, 2013, to prohibit PIP reimbursement for massage or for any other services performed by massage therapists. See 2012 Fla. ALS 197; see also Fla. Stat. § 627.736(1)(a)(5)("Medical benefits [that are reimbursable under the No-Fault Law] do not include massage …, regardless of the person, entity, or licensee providing massage …, and a licensed massage therapist … may not be reimbursed for medical benefits under this section.")

38.    The No-Fault Law was amended to prohibit PIP reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists. See, e.g., Florida House of Representatives Staff Analysis for House Bill 119 (amending the No-Fault Law)(noting that "PIP fraud remains rampant", and citing dramatic increases in PIP claims for massage therapy as a significant part of the problem).

39.    Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

40.    The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule that permits a physical therapist to delegate certain patient care activities an unlicensed assistant, that

exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist. See Fla. Stat. § 486.161(3).

41.    Health care practices in Florida may not collect PIP Benefits for any services performed by massage therapists, or for physical therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist.

**D.    No-Fault Reimbursement and Medical Necessity**

42.    Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for medically necessary services. See Fla. Stat. § 627.736. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services. Id.

43.    Pursuant to the No-Fault Law, "medically necessary" means:

a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

   (a) In accordance with generally accepted standards of medical practice;

   (b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and

   (c) Not primarily for the convenience of the patient, physician, or other health care provider.

See Fla. Stat. § 627.732.

**E.    No-Fault Billing and No-Fault Reimbursement**

44.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

   (i)    for any service or treatment that was not lawful at the time rendered;

   (ii)   to any person who knowingly submits a false or misleading statement relating to the claim or charges;

    (iii)    for any treatment or service that is upcoded; or

    (iv)    with respect to a bill or statement that does not substantially meet the billing requirements set forth in the No-Fault Law.

See Fla. Stat. § 627.736.

45.    The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare & Medicaid Services for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes, or billing codes. See Fla. Stat. § 627.736.

46.    By listing a health care practitioner in Box 31 of a HCFA-1500 form, the billing provider represents that the practitioner performed or directly supervised the underlying services, and "[t]o directly supervise, a doctor must be physically present at the facility". See Medicare Claims Processing Manual, Chapter 26, Item 31.

47.    Additionally, in order for a health care service to be eligible for PIP reimbursement, the applicable claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials." See Fla. Stat. § 627.736.

48.    PIP reimbursement for health care services is limited to $2,500.00 per injured person, unless a physician, physician assistant, or advanced practice registered nurse determines that the injured person suffered from an "emergency medical condition", in which case health care providers can be reimbursed up to $10,000.00 for health care services. See Fla. Stat. § 627.736.

49.     Pursuant to the No-Fault Law, an "emergency medical condition"  means a "medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) serious jeopardy to patient health. (b) serious impairment to bodily functions. (c) serious dysfunction of any bodily organ or part." Fla. Stat. § 627.732.

## II.     The Defendants' Fraudulent and Unlawful Scheme

19.     Since at least 2018, and continuing through the present day, the Defendants devised and implemented a fraudulent and unlawful scheme pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

## A.     The Defendants' Violations of the Clinic Act

20.     As part of the Defendants' fraudulent and unlawful scheme, Burak operated Affiliated Healthcare in pervasive violation of the Clinic Act.

21.     Affiliated Healthcare was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services [were] provided to individuals and which tender[ed] charges for reimbursement for services."

22.     However, Affiliated Healthcare never had a clinic license or medical director.

23.     Instead, Affiliated Healthcare was – at all times – owned by Burak, and purported to operate under the "wholly owned" exemption to the Clinic Act's licensing, operating, and medical director requirements.

24.     However, Burak never legitimately supervised the business activities of Affiliated Healthcare, inasmuch as Burak never conducted legitimate reviews of the billing or treatment records from Affiliated Healthcare to ensure that the billing was not fraudulent or unlawful, never ensured that all health care practitioners at Affiliated Healthcare had active appropriate

certification or licensure for the level of care being provided, and never made any attempt to remedy the fraudulent and unlawful charges submitted through Affiliated Healthcare, as described herein.

25.     To the contrary, Burak directed and participated in the fraudulent and unlawful scheme described herein.

26.     Moreover, Burak could not legitimately have supervised Affiliated Healthcare's business activities, because Affiliated Healthcare purported to provide health care services that were beyond the scope of Burak's chiropractic license.

27.     To the extent that Burak ever had any kind of health care license, the only license he had was a chiropractic license. Burak is not, and never has been, licensed as a physician.

28.     Even so, and in keeping with the fact that Burak could not legitimately have supervised the business activities of Affiliated Healthcare, Affiliated Healthcare regularly purported to provide various health care services that were beyond the scope of Burak's chiropractic license, including medical examinations, electrodiagnostic testing, PRP injections, pain management injections and procedures, arthroscopic surgeries, and MRIs.

29.     Accordingly, at all relevant times Affiliated Healthcare operated in violation of the Clinic Act.

30.     In the claims identified in Exhibit "1", the Defendants' PIP charges were fraudulent and unlawful in that they misrepresented that Affiliated Healthcare was compliant with Florida law and eligible to receive PIP reimbursement in the first instance.

31.     In fact, Affiliated Healthcare never was compliant with Florida law or eligible to receive PIP reimbursement, because it operated in pervasive violation of the Clinic Act.

32.     Not only did Burak operate Affiliated Healthcare in pervasive violation of the Clinic Act,  but Burak also acted to conceal Affiliated Healthcare's lack of compliance with the Clinic Act's health care licensure requirements.

33.     As set forth above, to qualify for the "wholly owned" exemption from the Clinic Act's health care clinic licensure requirements, all health care services provided through Affiliated Healthcare were required to be within the scope of Burak's chiropractic license.

34.     Even so, as set forth above, Affiliated Healthcare purported to provide various healthcare services beyond the scope of Burak's chiropractic license, including medical services and radiology services.

35.     However, to conceal the fact that various medical services and radiological services regularly were provided through Affiliated Healthcare, and to create a false illusion that Affiliated Healthcare did, in fact, qualify for the Clinic Act's "wholly owned" exemption:

(i)     on or about March 12, 2020, Burak and Affiliated Healthcare registered "AHC Diagnostic and Imaging Services" as a fictitious name for Affiliated Healthcare, and, thereafter, Burak submitted billing for MRIs purportedly performed through Affiliated Healthcare to GEICO under Affiliated Healthcare's tax identification number, but using the fictitious name "AHC Diagnostic and Imaging Services"; and

(ii)    on or about November 3, 2020, Burak and Affiliated Healthcare registered "Tri-County Comprehensive Surgical Centers" as a fictitious name for Affiliated Healthcare, and, thereafter, Burak submitted billing for certain medical services, including examinations, PRP injections, pain management injections and procedures, and arthroscopic surgeries purportedly performed through Affiliated Healthcare to GEICO under Affiliated Healthcare's tax identification number, but using the fictitious name "Tri-County Comprehensive Surgical Centers".

**B.     The Defendants' Unlawful Billing for Physical Therapy Services Performed by Massage Therapists**

36.     Between 2018 and the present, Affiliated Healthcare and Burak billed GEICO for purported "physical therapy" services provided to GEICO Insureds.

37. These purported "physical therapy" services billed through Affiliated Healthcare to GEICO were routinely performed by the Massage Therapists, and other massage therapists associated with Affiliated Healthcare, none of whom was ever licensed as a physical therapist.

38. For example:

(i) On January 17, 2018, Affiliated Healthcare and Burak purported to provide "physical therapy" services such as manual therapy, electrical stimulation, neuromuscular reeducation, and hot packs to an insured named SM and falsely contended in the resulting bills to GEICO that a licensed chiropractor associated with Affiliated Healthcare personally performed or at least directly supervised every one of those treatments, despite the fact that it was actually Bernuy – a massage therapist – who performed all of these treatments.

(ii) On September 9, 2019, Affiliated Healthcare and Burak purported to provide "physical therapy" services such as manual therapy, electrical stimulation, ultrasound, and hot packs to an insured named FB and falsely contended in the resulting bills to GEICO that a licensed chiropractor associated with Affiliated Healthcare personally performed or at least directly supervised every one of those treatments, despite the fact that it was actually Kennady – a massage therapist – who performed all of these treatments.

(iii) On November 18, 2020, Affiliated Healthcare and Burak purported to provide "physical therapy" services such as manual therapy, electrical stimulation, neuromuscular reeducation, manual traction, and hot packs to an insured named RL and falsely contended in the resulting bills to GEICO that a licensed chiropractor associated with Affiliated Healthcare personally performed or at least directly supervised every one of those treatments, despite the fact that it was actually Bernuy – a massage therapist – who performed all of these treatments.

(iv) On March 30, 2021, Affiliated Healthcare and Burak purported to provide "physical therapy" services such as manual therapy, electrical stimulation, mechanical traction, neuromuscular reeducation, and hot packs to an insured named MR and falsely contended in the resulting bills to GEICO that a licensed chiropractor associated with Affiliated Healthcare personally performed or at least directly supervised every one of those treatments, despite the fact that it was actually Montesinos – a massage therapist – who performed all of these treatments.

(v) On January 26, 2023, Affiliated Healthcare and Burak purported to provide "physical therapy" services such as manual therapy, neuromuscular reeducation, and hot packs to an insured named OH and falsely contended in the resulting bills to GEICO that a licensed chiropractor associated with Affiliated Healthcare personally performed or at least directly supervised every one of those treatments,

despite the fact that it was actually Montesinos – a massage therapist – who performed all of these treatments.

39.     The No-Fault Law and the Florida Physical Therapy Act prohibited Affiliated Healthcare from recovering PIP Benefits for services – including, but not limited to, physical therapy services – provided by massage therapists, such as the Massage Therapists.

40.     Affiliated Healthcare and Burak were well-aware of the fact that Affiliated Healthcare could not legally recover PIP Benefits for services performed by the Massage Therapists, or by any other massage therapists associated with Affiliated Healthcare. For example, the amendments to the No-Fault Law prohibiting PIP reimbursement for massage or for services provided by massage therapists were widely reported, as was the preceding legal struggle by various massage therapists and massage trade organizations to contest the amendments.

41.     Accordingly, in the claims for physical therapy services identified in Exhibit "1", in an attempt to conceal the fact that the "physical therapy" services provided by Affiliated Healthcare had been performed by massage therapists, and make it appear as if the services were eligible for PIP reimbursement, Affiliated Healthcare and Burak: (i) virtually always falsely represented that a licensed chiropractor associated with Affiliated Healthcare performed or at least directly supervised the services; and (ii) did not include the full names or license numbers of the Massage Therapists, or of any other massage therapist who was associated with Affiliated Healthcare, on the HCFA-1500 forms they used to bill for the services, despite the fact that in virtually every case, the Massage Therapists, or other massage therapists associated with Affiliated Healthcare, were the individuals who purported to perform the "physical therapy" services.

42.     Additionally, not only did the Massage Therapists and other massage therapists associated with Affiliated Healthcare routinely unlawfully perform the physical therapy services billed through Affiliated Healthcare to GEICO, they also did so without any legitimate direct

supervision by Burak, or by any other chiropractor or other licensed health care practitioner associated with Affiliated Healthcare.

43.     In keeping with the fact that neither Burak nor any chiropractor or other licensed health care practitioner associated with Affiliated Healthcare ever legitimately directly supervised the purported physical therapy services provided by Affiliated Healthcare, the "physical therapy" services that were billed through Affiliated Healthcare were medically unnecessary, inasmuch as the Insureds were given a substantially-identical physical therapy treatment plan at Affiliated Healthcare, which was not tailored to each individual patient's individual circumstances, presentation, and symptomatology, which in turn is at odds with the standard of care for physical or rehabilitative medicine.

44.     In the claims for physical therapy services identified in Exhibit "1", Affiliated Healthcare and Burak routinely misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the physical therapy services were routinely performed by the Massage Therapists, or other massage therapists associated with Affiliated Healthcare;

(ii)    Affiliated Healthcare could not lawfully recover PIP Benefits for the putative physical therapy services, because they were performed by massage therapists; and

(iii)   Affiliated Healthcare and Burak systematically misrepresented that the physical therapy services were legitimately performed or supervised by chiropractors or other licensed health care practitioners associated with Affiliated Healthcare, when in fact they were not.

45.     In this context, Burak – who at all relevant times purported to own Affiliated Healthcare – did not, and could not have, legitimately supervised the business activities of Affiliated Healthcare.

46.     Had Burak legitimately supervised the business activities of Affiliated Healthcare, Burak would have noted – among other things – that the physical therapy services were unlawfully performed by massage therapists, and unlawfully billed to GEICO.

**C.      The Defendants' Unlawful General Business Practice of Failing to Make a Good-Faith Effort to Collect Co-Payments or Deductibles from Their Patients.**

47.     During the relevant time period, the Defendants unlawfully engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute.

48.     In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through Affiliated Healthcare to GEICO for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the patient.

49.     In the claims identified in Exhibit "1", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because the Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute.

**D.      The Defendants' Fraudulent Treatment and Billing Protocol**

50.     In the claims identified in Exhibit "1", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

51.     Even so, in the claims identified in Exhibit "1", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided

pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the "treatment".

52.     The Defendants purported to provide their pre-determined fraudulent treatment protocol to the Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problems arising from any actual automobile accidents.

53.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

54.     No legitimate chiropractor or clinic would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

55.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because: (i) Affiliated Healthcare was, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight or a medical director who legitimately fulfilled the statutory duties of a medical director; and (ii) the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1.     The Fraudulent Claims for Initial Examinations**

56.      As an initial step in the Defendants' fraudulent scheme, Affiliated Healthcare and Burak purported to provide virtually all of the Insureds in the claims identified in Exhibit "1" with an initial examination.

57.     As set forth in Exhibit "1", the vast majority of initial examinations – usually performed by various physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare – were then billed, or caused to be billed, by Burak through Affiliated Healthcare to GEICO under: (i) CPT code 99203, typically resulting in a charge between $225.00 and $550.00 for each putative examination; (ii) CPT code 99204, typically resulting in a charge between $750.00 and $850.00 for each putative examination; or (iii) CPT code 99244, typically resulting in a charge between $400.00 and $850.00 for each putative examination.

58.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Affiliated Healthcare's eligibility to collect PIP Benefits in the first instance.

59.     In fact, and as set forth herein, Affiliated Healthcare never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

60.     As set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the initial examinations.

**a.     The Fraudulent Misrepresentation of Examinations as "Consultations"**

61.     In every claim identified in Exhibit "1" for initial examinations under CPT code 99244, Affiliated Healthcare and Burak falsely represented that they provided a "consultation", as opposed to an ordinary patient examination.

62.     Pursuant to the American Medical Association's CPT Assistant, which governs the use of CPT codes, the use of CPT code 99244 in health care billing represents that a physician has performed a consultation at the request of another physician or other appropriate source.

63.     Furthermore, pursuant to the CPT Assistant, the use of CPT code 99244 represents that the physician who purportedly conducted the consultation submitted a written consultation report to the physician or other appropriate source that purportedly requested the consultation in the first instance.

64.     Though Affiliated Healthcare and Burak frequently billed for neurological examinations in the claims identified in Exhibit "1" as consultations under CPT code 99244, no physician associated with Affiliated Healthcare who purported to perform the neurological examinations ever submitted any legitimate written consultation report to any physician or other appropriate source.

65.     In keeping with the fact that no physician associated with Affiliated Healthcare who purported to perform the neurological examinations ever submitted any legitimate written consultation report to any physician or other appropriate source, the "findings" set forth in the underlying "consultation reports" never were incorporated in any meaningful way in any of the Insureds' treatment plans.

66.     In the claims identified in Exhibit "1", Affiliated Healthcare and Burak misrepresented the neurological patient examinations to be consultations billable under CPT code 99244 because such consultations were reimbursable at a higher rate than commensurate, ordinary patient examinations.

**b.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

67.      In the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely misrepresented the severity of the Insureds' presenting problems.

68.      Pursuant to the CPT Assistant, the use of CPT codes 99204 and 99244 to bill for an initial patient examination typically required that the Insured present with problems of moderate to high severity.

69.      Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity

70.      However, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

71.      For instance, in most of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents and, to the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury diagnosis.

72.      Furthermore, in most of the claims identified in Exhibit "1", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in the accidents, or injured at all.

73.      Even so, in the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity.

74.     For example:

(i)     On April 24, 2018, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that ER's vehicle was drivable following the accident. The police report further indicated that ER was not injured during the accident. In keeping with the fact that ER was not seriously injured, ER did not visit any hospital emergency room following the accident. To the extent that ER experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of ER, which was purportedly performed by a nurse practitioner associated with Affiliated Healthcare on June 6, 2018, Affiliated Healthcare and Burak billed GEICO for an initial examination using CPT code 99203, and thereby falsely represented that ER presented with problems of moderate severity.

(ii)    On July 23, 2019, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured during the accident. In keeping with the fact that MJ was not seriously injured, MJ did not visit any hospital emergency room following the accident. To the extent that MJ experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MJ, which was purportedly performed by a physician associated with Affiliated Healthcare on March 9, 2021, Affiliated Healthcare and Burak billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that MJ presented with problems of moderate to high severity.

(iii)   On May 27, 2020, an Insured named RK was involved in an automobile accident. The contemporaneous police report indicated that RK's vehicle was drivable following the accident. The police report further indicated that RK was not injured during the accident. In keeping with the fact that RK was not seriously injured, RK did not visit any hospital emergency room following the accident. To the extent that RK experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of RK, which was purportedly performed by a physician associated with Affiliated Healthcare on July 15, 2020, Affiliated Healthcare and Burak billed GEICO for an initial examination using CPT code 99204, and thereby falsely represented that RK presented with problems of moderate to high severity.

(iv)    On May 21, 2022 an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured during the accident. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JH, which was purportedly performed by a nurse practitioner associated with Affiliated

Healthcare on July 13, 2022, Affiliated Healthcare and Burak billed GEICO for an initial examination using CPT code 99203, and thereby falsely represented that JH presented with problems of moderate severity.

(v)     On January 28, 2023 an Insured named JW was involved in an automobile accident. The contemporaneous police report indicated that JW's vehicle was drivable following the accident. The police report further indicated that JW was not injured during the accident. In keeping with the fact that JW was not seriously injured, JW did not visit any hospital emergency room following the accident. To the extent that JW experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of JW, which was purportedly performed by a physician associated with Affiliated Healthcare on March 16, 2023, Affiliated Healthcare and Burak billed GEICO for an initial examination using CPT code 99244, and thereby falsely represented that JW presented with problems of moderate to high severity.

75.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely falsely represented that the Insureds presented with problems of either moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT codes 99203, 99204, and 99244, because examinations billable under CPT codes 99203, 99204, and 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**c.     Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations**

76.     In addition, in the claims for initial examinations identified in Exhibit "1", when Affiliated Healthcare and Burak billed GEICO for putative initial examinations, they made the following misrepresentations regarding the nature and extent of the physical examinations that they purported to provide to the Insureds:

(i)     when billing GEICO for putative initial examinations using CPT code 99203 in the claims identified in Exhibit "1", Affiliated Healthcare and Burak falsely represented that the physicians, chiropractors, or nurse practitioners who purported to conduct

the examinations on behalf of Affiliated Healthcare conducted "detailed" physical examinations of the Insureds who purportedly received the examinations; and

(ii)     when billing GEICO for putative initial examinations using CPT codes 99204 and 99244 in the claims identified in Exhibit "1", Affiliated Healthcare and Burak falsely represented that the physicians, chiropractors, or nurse practitioners who purported to conduct the examinations on behalf of Affiliated Healthcare conducted "comprehensive" physical examinations of the Insureds who purportedly received the examinations.

77.      In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", no physician, chiropractor, or nurse practitioner associated with Affiliated Healthcare ever conducted a "detailed" patient examination because: (i) pursuant to the CPT Assistant, a "detailed" physical examination required – among other things – that the examining physician, chiropractor, or nurse practitioner document an extended examination of the affected body areas and other symptomatic or related organ systems; but (ii) no physician, chiropractor, or nurse practitioner associated with Affiliated Healthcare ever documented an extended examination of the Insureds' musculoskeletal systems or any of the Insureds' other systems.

78.      Additionally, with respect to the claims for  initial examinations under CPT codes 99204 and 99244 that are identified in Exhibit "1", no physician, chiropractor, or nurse practitioner associated with Affiliated Healthcare, ever conducted a "comprehensive" patient examination because: (i) pursuant to the CPT Assistant, a "comprehensive" physical examination required – among other things – that the examining physician, chiropractor, or nurse practitioner document a general examination of multiple patient organ systems or a complete examination of a single patient organ system; but (ii) no physician, chiropractor, or nurse practitioner associated with Affiliated Healthcare ever documented a general examination of multiple patient organ systems or a complete examination of a single patient organ system.

79.     For example:

(i)     On June 6, 2018, Affiliated Healthcare and Burak billed GEICO under CPT code 99204 for an initial examination of an Insured named SD, which was purportedly performed by a physician associated with Affiliated Healthcare, and thereby represented that the physician had provided a "comprehensive" physical examination to SD. However, the physician did not document findings with respect to at least eight of the Insured's organ systems, nor did the physician document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(ii)    On June 5, 2019, Affiliated Healthcare and Burak billed GEICO under CPT code 99203 for an initial examination of an Insured named TP, which was purportedly performed by a chiropractor associated with Affiliated Healthcare, and thereby represented that the chiropractor had provided a "detailed" physical examination to TP. However, the chiropractor did not document an extended examination of the Insured's musculoskeletal system, despite the fact that – to the extent the Insured had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)   On January 3, 2020, Affiliated Healthcare and Burak billed GEICO under CPT code 99203 for an initial examination of an Insured named MC, which was purportedly performed by a chiropractor associated with Affiliated Healthcare, and thereby represented that the chiropractor had provided a "detailed" physical examination to MC. However, the chiropractor did not document an extended examination of the Insured's musculoskeletal system, despite the fact that – to the extent the Insured had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)    On November 4, 2021, Affiliated Healthcare and Burak billed GEICO under CPT code 99244 for an initial examination of an Insured named KP, which was purportedly performed by a physician associated with Affiliated Healthcare, and thereby represented that the physician had provided a "comprehensive" physical examination to KP. However, the physician did not document findings with respect to at least eight of the Insured's organ systems, nor did the physician document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

(v)     On October 3, 2022, Affiliated Healthcare and Burak billed GEICO under CPT code 99204 for an initial examination of an Insured named KM, which was purportedly performed by a physician associated with Affiliated Healthcare, and thereby represented that the physician had provided a "comprehensive" physical examination to KM. However, the physician did not document findings with respect to at least eight of the Insured's organ systems, nor did the physician document a "complete" examination of the Insured's musculoskeletal systems or any of the Insured's other organ systems.

80.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely falsely represented that the physicians, chiropractors, and nurse practitioners who purported to perform the examinations on behalf of Affiliated Healthcare performed either "detailed" or "comprehensive" physical examinations of the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99203, 99204, and 99244, because examinations billable under CPT codes 99203, 99204, and 99244 are reimbursable at higher rates than examinations that are neither "detailed" nor "comprehensive".

**d.      Misrepresentations Regarding the Extent of Medical Decision-Making**

81.     Moreover, and pursuant to the CPT Assistant, in the claims for initial examinations identified in Exhibit "1", when Affiliated Healthcare and Burak billed GEICO for putative initial examinations under: (i) CPT code 99203, they falsely represented that the physicians, chiropractors, and nurse practitioners who purported to perform the examinations on behalf of Affiliated Healthcare engaged in some legitimate, low complexity medical decision-making in connection with the examinations; and (ii) CPT codes 99204 and 99244, they falsely represented that the physicians, chiropractors, and nurse practitioners who purported to perform the examinations on behalf of Affiliated Healthcare engaged in some legitimate, moderate complexity medical decision-making in connection with the examinations.

82.     In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

83.     Rather, in the claims for initial examinations identified in Exhibit "1": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant

complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all; and (iii) the physicians, chiropractors, and nurse practitioners who purported to perform the examinations on behalf of Affiliated Healthcare did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for virtually every Insured, regardless of the Insureds' true individual circumstances or presentation.

84. For example:

(i) On October 12, 2018, an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH was not seriously injured during the accident. In keeping with the fact that JH was not seriously injured, JH did not travel to any hospital emergency room following the accident. To the extent that JH experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on November 30, 2018, Affiliated Healthcare and Burak purported to provide an initial examination to JH – which purportedly was performed by a chiropractor associated with Affiliated Healthcare. The chiropractor did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the chiropractor did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Affiliated Healthcare, Burak, and the chiropractor provided JH with substantially the same false list of soft tissue injury "diagnoses" that Affiliated Healthcare, Burak, and the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare provided virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Affiliated Healthcare, Burak, and the chiropractor presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Affiliated Healthcare, Burak, and the chiropractor consisted of medically unnecessary chiropractic and physical therapy treatment, which did not pose any risk to JH if properly administered. Even so, Affiliated Healthcare and Burak billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the chiropractor engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On May 27, 2020, an Insured named PD was involved in an automobile accident. The contemporaneous police report indicated that PD's vehicle was drivable following the accident. The police report further indicated that PD refused medical attention at the scene. In keeping with the fact that PD was not seriously injured, PD did not travel to any hospital emergency room following the accident. To the extent that PD experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on July 15, 2020, Affiliated Healthcare and Burak purported to provide an initial examination to PD – which purportedly was performed by a physician associated with Affiliated Healthcare. The physician did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the physician did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Affiliated Healthcare, Burak, and the physician provided PD with substantially the same false list of soft tissue injury "diagnoses" that Affiliated Healthcare, Burak, and the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare provided virtually every other Insured. Furthermore, neither PD's presenting problems, nor the treatment plan provided to PD by Affiliated Healthcare, Burak, and the physician presented any risk of significant complications, morbidity, or mortality. To the contrary, PD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Affiliated Healthcare, Burak, and the physician consisted of medically unnecessary chiropractic and physical therapy treatment, which did not pose any risk to PD if properly administered. Even so, Affiliated Healthcare and Burak billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the physician engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)    On November 19, 2021, an Insured named DA was involved in an automobile accident. The contemporaneous police report indicated that DA's vehicle was drivable following the accident. The police report further indicated that DA was not injured during the accident. In keeping with the fact that DA was not seriously injured, DA did not visit any hospital emergency room following the accident. To the extent that DA experienced any health problems at all as a result of the accident, they were of low or minimal severity. Even so, on January 17, 2022, Affiliated Healthcare and Burak purported to provide an initial examination to DA – which purportedly was performed by a physician associated with Affiliated Healthcare. The physician did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the physician did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Affiliated Healthcare, Burak, and the physician provided DA with substantially the same false list of soft tissue injury "diagnoses" that Affiliated Healthcare, Burak, and the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare provided virtually every other Insured. Furthermore, neither DA's presenting problems, nor the treatment plan provided to DA by Affiliated

30

Healthcare, Burak, and the physician presented any risk of significant complications, morbidity, or mortality. To the contrary, DA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Affiliated Healthcare, Burak, and the physician consisted of medically unnecessary pain management procedures, which did not pose any risk to DA if properly administered. Even so, Affiliated Healthcare and Burak billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the physician engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)    On August 15, 2021, an Insured named CR was involved in a motorcycle accident. The contemporaneous police report indicated that CR's vehicle was drivable following the accident. The police report further indicated that CR suffered cuts and scrapes during the accident. In keeping with the fact that CR was not seriously injured, CR did not travel to any hospital emergency room following the accident. To the extent that CR experienced any health problems as a result of the accident, they were of low or minimal severity. Even so, on June 15, 2022, Affiliated Healthcare and Burak purported to provide an initial examination to CR – which purportedly was performed by a physician associated with Affiliated Healthcare. The physician did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the physician did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Affiliated Healthcare, Burak, and the physician provided CR with substantially the same false list of soft tissue injury "diagnoses" that Affiliated Healthcare, Burak, and the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare provided virtually every other Insured. Furthermore, neither CR's presenting problems, nor the treatment plan provided to CR by Affiliated Healthcare, Burak, and the physician presented any risk of significant complications, morbidity, or mortality. To the contrary, CR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Affiliated Healthcare, Burak, and the physician consisted of medically unnecessary chiropractic and physical therapy treatment, which did not pose any risk to CR if properly administered. Even so, Affiliated Healthcare and Burak billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the physician engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On May 21, 2022 an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured during the accident. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity. they were of low or minimal severity. Even so, on May 26, 2022, Affiliated Healthcare, Burak, and a chiropractor associated with

Affiliated Healthcare purported to provide an initial examination to JH. The chiropractor did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, the chiropractor did not consider any significant number of diagnoses or management options in connection with the examination. Instead, the chiropractor provided JH with substantially the same false list of soft tissue injury "diagnoses" that Affiliated Healthcare, Burak, and the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare provided virtually every other Insured. Furthermore, neither JH's presenting problems, nor the treatment plan provided to JH by Affiliated Healthcare, Burak, and the chiropractor presented any risk of significant complications, morbidity, or mortality. To the contrary, JH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Affiliated Healthcare, Burak, and the chiropractor consisted of medically unnecessary chiropractic and physical therapy treatment, which did not pose any risk to JH if properly administered. Even so, Affiliated Healthcare and Burak billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the chiropractor engaged in some legitimate, low complexity medical decision-making during the purported examination.

85.     In keeping with the fact that these putative "diagnoses" were pre-determined and falsified, Affiliated Healthcare and Burak frequently provided examinations – performed by physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare – on or about the same date, to two or more Insureds who had been involved in the same underlying accident and, at the conclusion of the examinations, Affiliated Healthcare, Burak, and the examining physicians, chiropractors, and nurse practitioners issued substantially identical, false "diagnoses", and recommended substantially identical courses of medically unnecessary "treatment" for the Insureds, despite the fact that the Insureds were differently situated.

86.     For example:

(i)     On July 26, 2018, three Insureds – BC, KH, and NH – were involved in the same automobile accident. Thereafter all three Insureds presented at Affiliated Healthcare for initial examinations – BC and KH on the exact same date, July 27, 2018, and NH three days later, on July 30, 2018. BC, KH, and NH were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that BC, KH, and NH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations – which were performed by a chiropractor associated with Affiliated Healthcare – Affiliated

Healthcare, Burak, and the chiropractor provided BC, KH, and NH with substantially identical, false soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all of them.

(ii)    On April 29, 2019, two Insureds – JC and CC – were involved in the same automobile accident. Thereafter both Insureds presented at Affiliated Healthcare for initial examinations on the <u>exact same date</u>, May 22, 2019. JC and CC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JC and CC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations – which were performed by a chiropractor associated with Affiliated Healthcare – Affiliated Healthcare, Burak, and the chiropractor provided JC and CC with substantially identical, false soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iii)   On November 22, 2020, <u>three</u> Insureds – CD, ND, and KW – were involved in the same automobile accident. Thereafter all three Insureds presented at Affiliated Healthcare for initial examinations – CD on November 4, 2020, and ND and KW, the following day, on November 5, 2020. CD, ND, and KW were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that CD, ND, and KW suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations – which were performed by a chiropractor associated with Affiliated Healthcare – Affiliated Healthcare, Burak, and the chiropractor provided CD, ND, and KW with substantially identical, false soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all of them.

(iv)   On March 12, 2022, two Insureds – RB and VB – were involved in the same automobile accident. Thereafter – incredibly – both Insureds presented at Affiliated Healthcare for initial examinations on the <u>exact same date</u>, March 25, 2022. RB and VB were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that RB and VB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations – which were performed by a physician associated with Affiliated Healthcare – Affiliated Healthcare, Burak, and the physician provided RB and VB with substantially identical, false soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)    On August 9, 2023, two Insureds – GT and JT – were involved in the same automobile accident. Thereafter, both Insureds presented at Affiliated Healthcare for initial examinations on the <u>exact same date</u>, November 3, 2021. GT and JT were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the

extent that GT and JT suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations – which were performed by a physician associated with Affiliated Healthcare – Affiliated Healthcare, Burak, and the physician provided GT and JT with substantially identical, false soft tissue injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

87.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare, Burak, and the examining physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare routinely provided substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and a substantially identical course of medically unnecessary "treatment" plan to the Insureds, despite the fact that they were differently situated and, in any case, did not require the treatment.

88.     In the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely falsely represented that the putative examinations involved legitimate, low complexity or moderate complexity medical decision making in order to create a false basis to bill for the initial examinations under CPT codes 99203, 99204, and 99244, because examinations billable under CPT codes 99203, 99204, and 99244 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

89.     In this context, Burak, who at all relevant times purported to own Affiliated Healthcare, did not – and could not have – legitimately supervised the business activities of Affiliated Healthcare.

90.     Had Burak legitimately supervised the business activities of Affiliated Healthcare, he would have noted – among other things – that Affiliated Healthcare's billing routinely fraudulently misrepresented that the putative initial examinations were legitimately and lawfully performed.

91.     Burak failed to do so because he never legitimately supervised the business activities of Affiliated Healthcare.

92.     In the claims for initial examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   Affiliated Healthcare never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinic was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

**2.     The Fraudulent and Unlawful Charges for Follow-Up Examinations at Affiliated Healthcare**

93.     In addition to their fraudulent initial examinations, Affiliated Healthcare and Burak purported to provide the vast majority of the Insureds in the claims identified in Exhibit "1" with multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

94.     In the claims identified in Exhibit "1", the follow-up examinations – which were performed by the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare – were then billed to GEICO, usually under CPT code 99214, typically resulting in a charge between $225.00 and $650.00 for each putative examination.

95.     In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Affiliated Healthcare's eligibility to collect PIP Benefits in the first instance.

96.     In fact, and as set forth herein, Affiliated Healthcare never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

97.     As set forth below, the charges for the follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and results of the follow-up examinations.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

98.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that the patient presented with problems of moderate to high severity.

99.     However, as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of low or minimal severity, even at their onset.

100.    Minor soft tissue injuries such as strains and sprains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "1" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or else their presenting problems were minimal.

101.    Even so, in the claims for the follow-up examinations under CPT code 99214 identified in Exhibit "1", Affiliated Healthcare and Burak falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all.

102.    For example:

(i)    On December 22, 2018, an Insured named ME was involved in an automobile accident. The contemporaneous police report indicated that ME's vehicle was drivable following the accident. The police report further indicated that ME was not injured during the accident. In keeping with the fact that ME was not seriously injured, ME did not visit any hospital emergency room following the accident. To the extent that ME experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a follow-up examination of ME – purportedly performed by a chiropractor associated with Affiliated Healthcare – more than three months after the accident, on April 10, 2019 Affiliated Healthcare and Burak billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that ME presented with problems of moderate to high severity.

(ii)    On July 23, 2019, an Insured named MJ was involved in an automobile accident. The contemporaneous police report indicated that MJ's vehicle was drivable following the accident. The police report further indicated that MJ was not injured during the accident. In keeping with the fact that MJ was not seriously injured, MJ did not visit any hospital emergency room following the accident. To the extent that MJ experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a follow-up examination of MJ – purportedly performed by a chiropractor associated with Affiliated Healthcare – more than three months after the accident, on November 12, 2020, Affiliated Healthcare and Burak billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that MJ presented with problems of moderate to high severity.

(iii)    On November 19, 2021, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA's vehicle was drivable following the accident. The police report further indicated that AA was not injured during the accident. In keeping with the fact that AA was not seriously injured, AA did not visit any hospital emergency room following the accident. To the extent that AA experienced any health problems at all as a result of the accident,

they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a follow-up examination of AA – purportedly performed by a chiropractor associated with Affiliated Healthcare – more than two months after the accident, on February 4, 2022, Affiliated Healthcare and Burak billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that AA presented with problems of moderate to high severity.

(iv)     On March 27, 2022 an Insured named CR was involved in an automobile accident. The contemporaneous police report indicated that CR was not injured during the accident. In keeping with the fact that CR was not seriously injured, CR did not visit any hospital emergency room following the accident. To the extent that CR experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a follow-up examination of CR – purportedly performed by a chiropractor associated with Affiliated Healthcare – more than four months after the accident, on August 8, 2022, Affiliated Healthcare and Burak billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that CR presented with problems of moderate to high severity.

(v)     On May 21, 2022 an Insured named JH was involved in an automobile accident. The contemporaneous police report indicated that JH's vehicle was drivable following the accident. The police report further indicated that JH was not injured during the accident. In keeping with the fact that JH was not seriously injured, JH did not visit any hospital emergency room following the accident. To the extent that JH experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had resolved or were minimal within a few weeks of the accident. Even so, following a follow-up examination of JH – purportedly performed by a chiropractor associated with Affiliated Healthcare – four months after the accident, on September 21, 2022, Affiliated Healthcare and Burak billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that JH presented with problems of moderate to high severity.

103.     These are only representative examples. In virtually all of the claims for follow-up examinations under CPT code 99214 identified in Exhibit "1", Affiliated Healthcare and Burak falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

104.    In the claims for follow-up examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99214, because examinations billable under CPT code 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

105.    What is more, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represented – among other things – that the examining physician, chiropractor, or nurse practitioner performed at least two of the following three components during the examination: (a) took a "detailed" patient history; (b) conducted a "detailed" physical examination; and (c) engaged in medical decision-making of "moderate complexity".

106.    However, in the claims for follow-up examinations identified in Exhibit "1, no physician, chiropractor, or nurse practitioner associated with Affiliated Healthcare ever took legitimate patient histories, conducted legitimate physical examinations, or engaged in legitimate medical decision-making at all.

107.    Rather, following the purported follow-up examinations, Affiliated Healthcare, Burak, and the examining physicians, chiropractors, and nurse practitioners simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary Fraudulent Services, often including chiropractic and physical therapy services, despite the fact that the Insureds purportedly already had received extensive chiropractic and physical therapy services that supposedly had not been

successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

108.    The ersatz "follow-up examinations" that Affiliated Healthcare and Burak purported to provide to the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Affiliated Healthcare's offices.

**c.    The Fraudulent Charges for Illusory Follow-Up Examinations**

109.    Additionally, Affiliated Healthcare and Burak routinely billed GEICO for multiple putative follow-up examinations – performed by the chiropractors associated with Affiliated Healthcare – under CPT codes 99213, 99212, and 99211 contemporaneous with their supposed provision of chiropractic manipulation.

110.    However, these supposed "examinations" were never truly separate services from the physical therapy and chiropractic services that supposedly were provided to the Insureds on the same dates as the supposed examinations.

111.    Pursuant to the CPT Assistant, a separate examination may be billed independent of charges for chiropractic manipulation only if the patient's condition requires an examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services.

112.    However, virtually none of the Insureds in the claims identified in Exhibit "1" required additional examination services above and beyond the usual pre- and post- manipulation

assessments that they received as a component of the chiropractic manipulation they received on the same dates of service as the purported examinations.

113.   Even so, Affiliated Healthcare and Burak routinely billed GEICO for follow-up examinations under CPT codes 99213, 99212, and 99211, despite the fact that the examinations purportedly were provided contemporaneously with chiropractic manipulation.

114.   In keeping with the fact that the follow-up examinations were illusory, the chiropractors who purported to perform the follow-up examinations did not create any substantive documentation in connection with the putative examinations.

115.   Even so, Affiliated Healthcare and Burak routinely submitted charges under CPT codes 99213, 99212, and 99211 for the illusory follow-up examinations.

116.   For example:

(i)     Affiliated Healthcare and Burak billed GEICO under CPT code 99211 for a follow-up examination of an Insured named AM that was purportedly performed by a chiropractor associated with Affiliated Healthcare contemporaneously with chiropractic manipulation and physical therapy services on December 18, 2019. This, despite the fact that: (a) no legitimate, separate follow-up examination was provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Affiliated Healthcare, Burak, and the chiropractor provided any patient assessments at all, they were part and parcel of the chiropractic services billed to GEICO that same date.

(ii)    Affiliated Healthcare and Burak billed GEICO under CPT code 99212 for a follow-up examination of an Insured named SP that was purportedly performed by a chiropractor associated with Affiliated Healthcare contemporaneously with chiropractic manipulation and physical therapy services on April 15, 2020. This, despite the fact that: (a) no legitimate, separate follow-up examination was provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Affiliated Healthcare, Burak, and the chiropractor provided any patient assessments at all, they were part and parcel of the chiropractic services billed to GEICO that same date.

(iii)   Affiliated Healthcare and Burak billed GEICO under CPT code 99211 for a follow-up examination of an Insured named SO that was purportedly performed by a

chiropractor associated with Affiliated Healthcare contemporaneously with chiropractic manipulation and physical therapy services on December 27, 2022. This, despite the fact that: (a) no legitimate, separate follow-up examination was provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Affiliated Healthcare, Burak, and the chiropractor provided any patient assessments at all, they were part and parcel of the chiropractic services billed to GEICO that same date.

(iv)     Affiliated Healthcare and Burak billed GEICO under CPT code 99213 for a follow-up examination of an Insured named KM that was purportedly performed by a chiropractor associated with Affiliated Healthcare contemporaneously with chiropractic manipulation and physical therapy services on February 16, 2023. This, despite the fact that: (a) no legitimate, separate follow-up examination was provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Affiliated Healthcare, Burak, and the chiropractor provided any patient assessments at all, they were part and parcel of the chiropractic services billed to GEICO that same date.

(v)     Affiliated Healthcare and Burak billed GEICO under CPT code 99211 for a follow-up examination of an Insured named KC that was purportedly performed by a chiropractor associated with Affiliated Healthcare contemporaneously with chiropractic manipulation and physical therapy services on May 18, 2023. This, despite the fact that: (a) no legitimate, separate follow-up examination was provided; (b) the patient's condition did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (c) to the extent that Affiliated Healthcare, Burak, and the chiropractor provided any patient assessments at all, they were part and parcel of the chiropractic services billed to GEICO that same date.

117.     These are only representative examples. Affiliated Healthcare and Burak routinely submitted duplicative charges for illusory follow-up examinations, despite the fact that: (i) no legitimate follow-up examination services were provided; (ii) the patients' conditions did not require examination above and beyond the usual pre- and post- manipulation assessment associated with chiropractic services; and (iii) pre-manipulation patient assessments were part and parcel of the putative chiropractic manipulations billed by Affiliated Healthcare and Burak on those same dates of service under CPT codes 98940, 98941, and 98943.

118. Affiliated Healthcare and Burak submitted charges for the duplicative and illusory follow-up examinations in order to maximize the amount of fraudulent and unlawful billing they could submit to insurers, including GEICO.

119. In this context, Burak, who at all relevant times purported to own Affiliated Healthcare, did not – and could not have – legitimately supervised the business activities of Affiliated Healthcare.

120. Had Burak legitimately supervised the business activities of Affiliated Healthcare, he would have noted – among other things – that Affiliated Healthcare routinely fraudulently misrepresented that the putative follow-up examinations were legitimately and lawfully performed.

121. Burak failed to do so, because he never actually supervised the business activities of Affiliated Healthcare.

122. In the claims for follow-up examinations identified in Exhibit "1", Affiliated Healthcare and Burak routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially-identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii) Affiliated Healthcare never was eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they were operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

**3.     The Fraudulent Charges for Range of Motion and Muscle Strength Testing**

123.     In an attempt to maximize the fraudulent billing that they could submit or cause to be submitted for each Insured, after purporting to provide initial examinations to the Insureds, Affiliated Healthcare and Burak purported to provide many Insureds one or more rounds of medically unnecessary range of motion and muscle strength tests.

124.     As set forth in Exhibit "1", the medically unnecessary range of motion and muscle strength tests – which purportedly were performed by the chiropractors associated with Affiliated Healthcare – were then billed by Affiliated Healthcare and Burak to GEICO under: (i) CPT code 95851, for the muscle strength tests; and (ii) CPT codes 95831 and 95832 for the range of motion tests, typically resulting in at least $120.00 in total charges for each round of the tests.

125.     In the claims for range of motion and muscle strength tests identified in Exhibit "1", the charges for the range of motion and muscle strength tests were fraudulent in that they misrepresented Affiliated Healthcare's eligibility to collect PIP Benefits in the first instance.

126.     In fact, and as set forth above, Affiliated Healthcare never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

127.     As set forth below, the Defendants' charges for the range of motion and muscle strength tests identified in Exhibit "1" also were fraudulent in that they misrepresented the medical necessity of the putative range of motion and muscle strength tests.

**a.     Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength**

128.     The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety.  The body's hinged joints and ball-

and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

129.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

130.    A traditional, or manual, range of motion test consists of a non-electronic measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a traditional range of motion test, the physician asks the patient to move his or her joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

131.    Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body in a given direction against resistance applied by the physician.  For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, the physician would apply resistance against the patient's leg while having them move the leg up, then apply resistance against the patient's leg while having them move the leg down.

132.    Physical examinations performed on patients with soft-tissue trauma – the complaint supposedly advanced by virtually every Insured who treated with Affiliated Healthcare – necessarily require range of motion and muscle strength tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a health care practitioner knows the extent of a given patient's joint or muscle strength impairment, there is no way to properly

diagnose or treat the patient's injuries. Evaluation of range of motion and muscle strength is an essential component of the "hands-on" examination of a trauma patient.

133.    Because range of motion and muscle strength tests must be conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, range of motion and muscle strength tests are reimbursed as an element of the examinations.

134.    In other words, health care providers cannot conduct and bill for a patient examination, then bill separately for contemporaneously-provided range of motion and muscle strength tests.

**b.    The Duplicate Billing for Medically Unnecessary Range of Motion and Muscle Strength Tests**

135.    To the extent that Affiliated Healthcare and Burak actually provided initial examinations and follow-up examinations in the first instance, the physicians, chiropractors, and nurse practitioners associated with Affiliated Healthcare who purported to perform the examinations purported to conduct range of motion and manual muscle tests on virtually every Insured during each initial and/or follow-up examination.

136.    The charges for these range of motion and manual muscle tests were part and parcel of the charges that Affiliated Healthcare and Burak routinely submitted for the examinations under CPT codes 99203, 99204, 99213, 99214, and 99215.

137.    Despite the fact that every Insured already purportedly had undergone range of motion and muscle testing during their examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the examinations, Affiliated Healthcare and Burak regularly purported to provide, and bill for, a series of range of motion and muscle strength tests to GEICO Insureds.

138.    Though the Insureds routinely visited Affiliated Healthcare for examinations and other Fraudulent Services, Affiliated Healthcare and Burak often deliberately caused appointments for range of motion and muscle strength tests to be scheduled on separate dates from the examinations, to create the appearance that the procedures were separate and distinct from the examinations, and therefore reimbursable.

139.    The information gained through the use of the range of motion and muscle strength tests was not significantly different from the information obtained through the testing that was part and parcel of virtually every Insured's initial and follow-up examinations.

140.    The range of motion and muscle strength tests were part of the Defendants' fraudulent scheme, inasmuch as the "services" were rendered pursuant to a pre-established protocol that: (i) in no way aided in the assessment and treatment of the Insureds; and (ii) was designed solely to financially enrich the Defendants.

**4.    The Fraudulent Charges for Chiropractic and "Physical Therapy" Services at Affiliated Healthcare**

141.    In addition to their other Fraudulent Services, Affiliated Healthcare and Burak virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to months of medically unnecessary chiropractic and purported physical therapy services.

142.    As set forth in Exhibit "1", the putative chiropractic and physical therapy services – purportedly performed by chiropractors and massage therapists associated with Affiliated Healthcare, including the Massage Therapists, respectively – were billed by Affiliated Healthcare and Burak through Affiliated Healthcare to GEICO under:

(i)     CPT code 97010, for putative hot/cold pack application, typically resulting in a charge of $40.00 for each round of hot/cold pack therapy they purported to provide;

(ii)    CPT code 97012, for putative mechanical traction therapy, typically resulting in a charge of $55.00 for each round of mechanical traction they purported to provide;

(iii)   CPT code 97018, for putative paraffin bath treatment, typically resulting in a charge of $45.00 for each round of paraffin bath treatment they purported to provide;

(iv)   CPT code 97018, for putative ultrasound, typically resulting in a charge of $60.00 for each round of ultrasound they purported to provide;

(v)   CPT code 97110, for putative therapeutic exercises, typically resulting in a charge of $75.00 for each round of round of therapeutic exercises they purported to provide;

(vi)   CPT code 97112, for putative neuromuscular reeducation, typically resulting in a charge of $70.00 for each round of round of neuromuscular reeducation they purported to provide;

(vii)   CPT code 97140, for putative manual therapy, typically resulting in a charge of $85.00 for each round of round of manual therapy they purported to provide;

(viii)   CPT codes 98940, 98941, and/or 98943 for putative chiropractic manipulative treatment, typically resulting in charges of between $45.00 and $70.00 for each round of chiropractic manipulative treatment they purported to provide; and

(ix)   Health Care Common Procedure Coding System ("HCCPCS") code G0283 for putative electric stimulation treatments, typically resulting in a charge of $55.00 for each round of electrical stimulation they purported to provide.

143.    In the claims for chiropractic and purported physical therapy services identified in Exhibit "1" the charges for the chiropractic and physical therapy services were fraudulent in that they misrepresented Affiliated Healthcare's eligibility to collect PIP Benefits in the first instance.

144.    In fact, Affiliated Healthcare never was eligible to collect PIP Benefits, inasmuch as it was operated in violation of the licensing and operating requirements set forth in the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

145.    In the claims for physical therapy services identified in Exhibit "1", the charges for the physical therapy also were fraudulent, unlawful, and non-reimbursable in that they were routinely performed by massage therapists associated with Affiliated Healthcare, including the Massage Therapists.

146.     In the claims identified in Exhibit "1", the charges for physical therapy and chiropractic services also were fraudulent in that they misrepresented the nature and medical necessity of the services.

147.     In a legitimate clinical setting, each individual patient's physical therapy and/or chiropractic treatment schedule, and the specific treatment modalities that will be used, must be tailored to the specific patient's circumstances, symptomatology, and presentation.

148.     In a legitimate clinical setting, the nature of, extent of, and schedule for physical therapy and chiropractic treatment is constantly adjusted for each individual patient based on each patient's treatment progress, as assessed during each patient's follow-up examinations and on an ongoing basis as they receive the physical therapy or chiropractic treatment.

149.     In keeping with the fact that the purported physical therapy and chiropractic services that were billed through Affiliated Healthcare to GEICO were not medically necessary, no chiropractor, massage therapist, or any other health care practitioner associated with Affiliated Healthcare tailored the chiropractic or physical therapy services they purported to perform to each Insured's individual circumstances and presentment.

150.     There are a large number of individual types of physical therapy and chiropractic services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

151.     However, Affiliated Healthcare, Burak, and the chiropractors and massage therapists, including the Massage Therapists, associated with Affiliated Healthcare who purported to perform the physical therapy and chiropractic services, routinely purported to provide the same handful of chiropractic and physical therapy "treatments" to virtually every Insured in the claims

identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

152.    Specifically, with respect to the substantial majority of Insureds in the claims identified in Exhibit "1", Affiliated Healthcare, Burak, and the chiropractors and massage therapists, including the Massage Therapists, associated with Affiliated Healthcare who purported to perform the physical therapy and chiropractic services, purported to provide one-to-two months of chiropractic and physical therapy services, virtually always consisting of chiropractic adjustments, hot/cold pack application, mechanical traction, paraffin baths, ultrasound, therapeutic exercises, neuromuscular reeducation, manual therapy, and/or electric stimulation. This, despite the fact that the Insureds were differently situated, and could not possibly all have required a substantially identical course of chiropractic and physical therapy treatment.

**5.    The Fraudulent Charges for MRIs**

153.    Based on the falsified, pre-determined results of their patient examinations, the Defendants routinely purported to subject the Insureds in the claims identified in Exhibit "1" to medically unnecessary diagnostic imaging services, including MRIs.

154.    Affiliated Healthcare and Burak then billed the MRIs – which were performed by a physician associated with Affiliated Healthcare – through Affiliated Healthcare to GEICO under CPT codes 70551, 70554, 72141, 72148, 73221, and 73721, typically resulting in thousands of dollars in charges for each Insured who supposedly received the MRIs.

155.    In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic test in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

156.    For example, the American College of Radiology – an almost 100 year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science and professions of radiological care – has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

157.    Along similar lines, the American College of Physicians – a more than 100 year-old professional organization with a mission to enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine – likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

158.    In fact, in a legitimate clinical setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents generally should not receive MRIs until they receive at least four to eight weeks of conservative treatment.

159.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

160.    Even so, in many cases, the Defendants provided medically unnecessary MRIs to Insureds as an initial form of diagnostic testing, soon after the Insureds' underlying automobile accidents. This, despite the fact that the Insureds had not suffered any injuries that would warrant MRIs, and – in any case – had not, and could not have, legitimately tried and failed a course of conservative treatment at the time when the MRIs purportedly were provided.

161.    For example:

(i)      On May 27, 2020, an Insured named RK was involved in an automobile accident. The contemporaneous police report indicated that RK's vehicle was drivable following the accident. The police report further indicated that RK was not injured during the accident. In keeping with the fact that RK was not seriously injured, RK did not visit any hospital emergency room following the accident. To the extent that RK experienced any health problems at all as a result of the accident, they were of low or minimal severity and did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Affiliated Healthcare and Burak purported to provide, and billed GEICO for, medically unnecessary MRIs of RK's cervical and lumbar spine, which were purportedly performed by a physician associated with Affiliated Healthcare on June 15, 2020 – before RK had a chance to complete any legitimate course of conservative treatment.

(ii)     On May 27, 2020, an Insured named PD was involved in an automobile accident. The contemporaneous police report indicated that PD's vehicle was drivable following the accident. The police report further indicated that PD refused medical attention at the scene. In keeping with the fact that PD was not seriously injured, PD did not travel to any hospital emergency room following the accident. To the extent that PD experienced any health problems as a result of the accident, they were of low or minimal severity and did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Affiliated Healthcare and Burak purported to provide, and billed GEICO for, medically unnecessary MRIs of PD's cervical and lumbar spine, which were purportedly performed by a physician associated with Affiliated Healthcare on June 15, 2020 – before PD had a chance to complete any legitimate course of conservative treatment.

(iii)    On September 12, 2021, an Insured named KP was involved in an automobile accident. The contemporaneous police report indicated that KP suffered, at most, minor injuries during the accident. The following day, KP traveled to Baptist Hospital on her own. In keeping with the fact that KP was not seriously injured, contemporaneous hospital records indicate that KP was briefly observed on an outpatient basis, and then discharged after a few hours with nothing more serious than a soft tissue injury. To the extent that KP experienced any health problems as a result of the accident, they were of low or minimal severity and did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Affiliated Healthcare and Burak purported to provide, and billed GEICO for, a medically unnecessary MRI of KP's cervical spine, which was purportedly performed by a physician associated with Affiliated Healthcare on October 1, 2021 – before KP had a chance to complete any legitimate course of conservative treatment.

(iv)    On March 21, 2022, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that JB was not injured during the accident. In keeping with the fact that JB was not seriously injured, JB did not visit any hospital emergency room following the accident. To the extent that JB

experienced any health problems at all as a result of the accident, they were of low or minimal severity and did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Affiliated Healthcare and Burak purported to provide, and billed GEICO for, medically unnecessary MRIs of JB's cervical and lumbar spine, which were purportedly performed by a physician associated with Affiliated Healthcare on April 4, 2022 – before JB had a chance to complete any legitimate course of conservative treatment.

(v)     On October 31, 2022, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured during the accident. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as a result of the accident, they were of low or minimal severity and did not require MRIs, especially before the Insured had failed a course of conservative treatment. Even so, Affiliated Healthcare and Burak purported to provide, and billed GEICO for, medically unnecessary MRIs of SM's cervical and lumbar spine on November 11, 2022, which was before SM had a chance to complete any legitimate course of conservative treatment.

162.    These are only representative examples. In fact, the GEICO Insureds receiving MRIs from Affiliated Healthcare frequently had medically unwarranted MRIs performed before they had a chance to complete any legitimate course of conservative treatment.

**6.     The Fraudulent Charges for Electrodiagnostic Testing**

163.    As set forth in Exhibit "1" based upon the fraudulent, predetermined "diagnoses" provided during the initial and follow-up examinations, Affiliated Healthcare and Burak purported to provide many Insureds medically unnecessary, useless, and illusory electrodiagnostic tests, predominantly consisting of nerve conduction velocity ("NCV") tests.

164.    As set forth in Exhibit "1", Affiliated Healthcare and Burak billed the NCV tests – typically performed by a physician associated with Affiliated Healthcare – to GEICO primarily under CPT code 95911, usually resulting in a charge of $1,435.68 for each putative NCV test.

165.    The charges for the NCV tests were fraudulent in that the electrodiagnostic tests were medically unnecessary and were performed – to the extent that they were performed at all –

pursuant to the fraudulent boilerplate "findings" and "diagnoses" that Affiliated Healthcare and Burak purported to provide during their falsified initial and follow-up examinations, and not to treat or otherwise benefit the Insureds.

166.    Moreover, in the claims for NCV tests identified in Exhibit "1", the charges for the NCV tests were fraudulent in that they misrepresented Affiliated Healthcare's eligibility to collect PIP Benefits in the first instance.

**a.    The Human Nervous System and Electrodiagnostic Testing**

167.    The human nervous system is composed of the brain, spinal cord, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet.

168.    Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

169.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.

170.    Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

171.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched nerve" can occur where there is compression or irritation of a spinal nerve root. An individual with a

"pinched nerve" may experience symptoms consistent with a radiculopathy, including pain, altered sensation, and loss of muscle control.

172.     NCV and electromyography ("EMG") are both forms of electrodiagnostic tests used to diagnose various forms of neuropathies, including radiculopathies.

173.     Affiliated Healthcare and Burak purportedly provided NCV tests to many Insureds because the NCV tests supposedly were medically necessary to determine whether the Insureds had radiculopathies.

174.     The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

175.     The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

176.     According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

177.     However, according to the Recommended Policy, both NCV tests and EMG tests normally must be performed together in order to provide a clinical diagnosis of peripheral nervous system disorders, including radiculopathies. As the Recommended Policy states:

Radiculopathies cannot be diagnosed by NCS [i.e., NCV tests] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.

…

The EDX laboratory must have the ability to perform needle EMGs. NCSs should not be performed without needle EMG except in unique circumstances."

**b.**     **The Fraudulent NCV Tests**

178.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

179.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

180.    As set forth above, to be clinically useful in the diagnoses of peripheral nervous system disorders, NCVs and EMGs must be performed together.

181.    In the claims for NCV tests identified in Exhibit "1", Affiliated Healthcare and Burak regularly billed for the NCV tests despite the fact that no corresponding EMG tests had been performed, making the NCV tests useless in the diagnosis and treatment of the Insureds.

182.    Moreover, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Affiliated Healthcare, Burak, and Marquez routinely purported to test far more nerves than recommended by the Recommended Policy.

183.   Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Affiliated Healthcare and Burak routinely purported to provide NCV tests of 9 -10 nerves, despite not performing contemporaneous EMG tests as necessary to properly diagnose a radiculopathy.

184.   For example:

(i)     Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 9-10 nerve NCV test – purportedly performed by a physician associated with Affiliated Healthcare – to an Insured named TS on August 15, 2018, supposedly to determine whether TS had a radiculopathy. However, Affiliated Healthcare, Burak, and the physician did not contemporaneously provide TS with EMG testing, rendering the NCV testing medically useless.

(ii)    Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 9-10 nerve NCV test – purportedly performed by a physician associated with Affiliated Healthcare – to an Insured named JS on December 12, 2019, supposedly to determine whether JS had a radiculopathy. However, Affiliated Healthcare, Burak, and the physician did not contemporaneously provide JS with EMG testing, rendering the NCV testing medically useless.

(iii)   Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 9-10 nerve NCV test – purportedly performed by a physician associated with Affiliated Healthcare – to an Insured named ML on June 3, 2021, supposedly to determine whether ML had a radiculopathy. However, Affiliated Healthcare. Burak, and the physician did not contemporaneously provide ML with EMG testing, rendering the NCV testing medically useless.

(iv)    Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 9-10 nerve NCV test– purportedly performed by a physician associated with Affiliated Healthcare – to an Insured named BV on July 7, 2022, supposedly to determine whether BV had a radiculopathy. However, Affiliated Healthcare, Burak, and the physician did not contemporaneously provide BV with EMG testing, rendering the NCV testing medically useless.

(v)     Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 9-10 nerve NCV test – purportedly performed by a physician associated with Affiliated Healthcare – to an Insured named JG on March 23, 2023, supposedly to determine whether JG had a radiculopathy. However, Affiliated Healthcare, Burak, and the physician did not contemporaneously provide JG with EMG testing, rendering the NCV testing medically useless.

185.     Not only did Affiliated Healthcare and Burak routinely bill GEICO for medically unnecessary NCV tests, but they also routinely and fraudulently performed NCV testing over the course of two days and then split the charges for the NCV tests onto two separate bills to conceal the excessive, medically unnecessary testing, and to circumvent the structural limit on excessive nerve testing that is built into the CPT codes.

186.     In particular, the billing codes for NCV testing are limited to the following CPT codes:

| CPT Code | Number of Nerve Studies |
|----------|-------------------------|
| 95907 | 1-2 nerve studies |
| 95908 | 3-4 nerve studies |
| 95909 | 5-6 nerve studies |
| 95910 | 7-8 nerve studies |
| 95911 | 9-10 nerve studies |
| 95912 | 11-12 nerve studies |
| 95913 | 13 or more nerve studies |

187.     What is more, according to the American Academy of Physical Medicine and Rehabilitation, multiple NCV CPT codes cannot be billed for a given patient on a single day.

188.     Accordingly, the maximum number of nerve studies for an individual patient in a single day for which a provider will be compensated is capped at 13.

189.     Therefore, to circumvent the limit of 13 on the number of nerve studies for an individual patient for which they could bill, Affiliated Healthcare and Burak frequently purported to provide the tests on multiple days and then split the billing for the excessive NCV tests into two separate bills for each individual Insured.

190.     For example:

(i)     Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 18 - 20 nerve NCV test to an Insured named MT, which was purportedly performed by a physician associated with Affiliated Healthcare over the course of two separate dates of service – January 8, 2019 and January 9, 2019 – supposedly to determine whether MT had a radiculopathy.

(ii)    Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 18 - 20 nerve NCV test to an Insured named MF, which was purportedly performed by a physician associated with Affiliated Healthcare over the course of two separate dates of service – November 7, 2019 and November 8, 2019 – supposedly to determine whether MF had a radiculopathy.

(iii)   Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 18 - 20 nerve NCV test to an Insured named KC, which was purportedly performed by a physician associated with Affiliated Healthcare over the course of two separate dates of service –  November 19, 2020 and December 3, 2020 – supposedly to determine whether KC had a radiculopathy.

(iv)    Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 18 - 20 nerve NCV test to an Insured named KA, which was purportedly performed by a physician associated with Affiliated Healthcare over the course of two separate dates of service – August 9, 2021 and August 25, 2021 – supposedly to determine whether KA had a radiculopathy.

(v)     Affiliated Healthcare and Burak purported to provide an excessive and medically unnecessary 18 - 20 nerve NCV test to an Insured named DA, which was purportedly performed by a physician associated with Affiliated Healthcare over the course of two separate dates of service – March 31, 2022 and April 7, 2022 – supposedly to determine whether DA had a radiculopathy.

**8.     The Fraudulent Charges for Platelet-Rich Plasma Injections, Pain Management Injections and Procedures, and Arthroscopic Surgeries**

191.    As part of their fraudulent scheme, Affiliated Healthcare and Burak purported to provide many Insureds with platelet-rich plasma ("PRP") injections, pain management injections and procedures, and arthroscopic surgeries. PRP injection, pain management injections and procedures, and arthroscopic surgeries are health care services that are outside the scope of the chiropractic license of Burak.

### a.     Platelet-Rich Plasma Injections

192.    As set forth in Exhibit "1", Affiliated Healthcare and Burak billed the PRP injections – typically performed by a physician associated with Affiliated Healthcare – to GEICO under CPT code 0232T, resulting in a charge of $3,500.00 for each PRP injection.

193.    Platelet-rich plasma is a blood plasma that has been enriched with platelets from a patient's own blood. The platelets purportedly contain alpha granules that are rich in several growth factors, such as platelet-derived growth factor, transforming growth factor-β, insulin-like growth factor, vascular endothelial growth factor, and epidermal growth factor, which supposedly play key roles in tissue repair mechanisms.

194.    In order to perform a platelet-rich plasma injection, the medical provider draws blood, places it into a centrifuge to separate the blood's plasma (containing the platelets) from the red blood cells, and then injects the platelets into the site of the patient's injury.

### b.     Pain Management Injections and Procedures

195.    As set forth in Exhibit "1", Affiliated Healthcare and Burak typically billed the pain management injections and procedures – performed by a physician associated with Affiliated Healthcare – to GEICO under CPT codes 20552, 205553, 20605, 20610, and 64990-64995, typically resulting in a charge between $695.00 and $5,000.00 for each injection or procedure.

### c.     Arthroscopic Surgeries

196.    As set forth in Exhibit "1", Affiliated Healthcare and Burak typically billed the arthroscopic surgeries –performed by a physician associated with Affiliated Healthcare – to GEICO under CPT codes 29807, 29820, 29822, 29826, 29827, 29875, 29876, 29882, and 29897, typically resulting in a charge between $3,250.00 and $21,400.00 for each surgical procedure.

**d.    The Medically Unnecessary PRP Injections, Pain Management Injections and Procedures, and Arthroscopic Surgeries**

197.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom Affiliated Healthcare and Burak purported to treat were involved in relatively minor accidents.

198.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all.

199.    Even so, Affiliated Healthcare and Burak routinely purported to provide medically unnecessary PRP injections, pain management injections and procedures, and arthroscopic surgeries to Insureds who had been involved in minor accidents – and who had not suffered any injury more serious than a sprain or strain – months after the underlying accidents, long after the Insureds' minor sprains and strains had resolved.

200.    Affiliated Healthcare and Burak purported to provide the medically useless PRP injections, pain management injections and procedures, and arthroscopic surgeries to Insureds who had been involved in minor accidents in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not to benefit the Insureds who supposedly were subjected to them.

**III.    The Fraudulent Claims the Defendants Submitted or Caused to be Submitted to GEICO**

201.    To support their fraudulent charges, Affiliated Healthcare and Burak systematically submitted or caused to be submitted thousands of bills and treatment reports through Affiliated Healthcare to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

202.    The claims that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following, material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Affiliated Healthcare was in compliance with Florida law and therefore was eligible to collect PIP Benefits in the first instance. In fact, Affiliated Healthcare was never eligible to collect PIP Benefits in the first instance because, among other things, Affiliated Healthcare: (a) operated in violation of the Clinic Act; (b) engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims statute; and (c) operated in violation of the Physical Therapy Act.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement, because they were provided – to the extent that they were provided at all – pursuant to the Defendants' pre-determined fraudulent treatment and billing protocol, were medically unnecessary, and were performed by massage therapists.

(iii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA-1500 forms reports submitted by and on behalf of the Defendants frequently misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

203.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO. Even so, the Defendants knowingly misrepresented and concealed facts related to Affiliated Healthcare in an effort to prevent discovery that the Defendants operated in pervasive

violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act and to prevent discovery that the Fraudulent Services were medically unnecessary and, in many cases, illusory, and that many of the services were routinely performed by massage therapists.

204.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $6,000,000.00.

205.    GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it commenced this action.

### FIRST CAUSE OF ACTION
### Against Affiliated Healthcare
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

206.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-205, above.

207.    There is an actual case in controversy between GEICO and Affiliated Healthcare regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

208.    Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO because it was unlawfully operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act.

209.    Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided or

billed to GEICO, and because the many of the underlying services were not performed by individuals who actually were licensed to perform the pertinent services, or else constituted non-reimbursable massage.

210.    Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary, in many cases, were performed by massage therapists, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

211.    Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

212.    Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

213.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Burak**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

214.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-205, above.

215.    Affiliated Healthcare is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

216.    Burak knowingly has conducted and/or participated, directly or indirectly, in the conduct of Affiliated Healthcare's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Affiliated Healthcare was not eligible to receive under the No-Fault Law because: (i) Affiliated Healthcare unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act; (ii) the underlying Fraudulent Services were not lawfully provided; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services never were provided in the first instance; (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; (vi) Affiliated Healthcare routinely billed GEICO for services performed by massage therapists in violation of the No-Fault Law and Physical Therapy Act; and (vii) Affiliated Healthcare engaged in the general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from its' patients in violation of the False and Fraudulent Insurance Claims statute.

217.     A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

218.     Affiliated Healthcare's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Burak operated Affiliated Healthcare, inasmuch as Affiliated Healthcare was not engaged in a legitimate health care practice, and acts of mail fraud therefore were essential in order for Affiliated Healthcare to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Affiliated Healthcare to the present day.

219.     Affiliated Healthcare is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Affiliated Healthcare in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

220.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000,000.00 pursuant to the fraudulent bills submitted through Affiliated Healthcare.

221.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964, and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Affiliated Healthcare and Burak
### (Under Fla. Stat. 501.201 et. seq.)

222.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-205, above.

223.    Affiliated Healthcare and Burak are actively engaged in trade and commerce in the State of Florida.

224.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

225.    Affiliated Healthcare and Burak engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

226.    The bills and supporting documents submitted by Affiliated Healthcare and Burak to GEICO in connection with the Fraudulent Services were fraudulent, unfair, deceptive, and unconscionable in that they misrepresented: (i) Affiliated Healthcare's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and eligible for payment; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

227.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Affiliated Healthcare and Burak has been materially injurious to GEICO and its Insureds.

228.    The conduct of Affiliated Healthcare and Burak was the actual and proximate cause of the damages sustained by GEICO.

229.    Affiliated Healthcare and Burak's unfair and deceptive acts have caused GEICO to sustain damages of at least $6,000,000.00.

230.    By reason of Affiliated Healthcare and Burak's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

**FOURTH CAUSE OF ACTION**
**Against Affiliated Healthcare and Burak**
**(Common Law Fraud)**

231.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-205, above.

232.    Affiliated Healthcare and Burak intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Affiliated Healthcare for the Fraudulent Services.

233.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that that Affiliated Healthcare was in compliance with the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act and eligible to collect PIP Benefits in the first instance, when in fact Affiliated Healthcare never was in compliance with the Clinic Act, the False and Fraudulent Insurance Claims statute, and the Physical Therapy Act and never was eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

234.    Affiliated Healthcare and Burak intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Affiliated Healthcare that were not reimbursable.

235.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $6,000,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Affiliated Healthcare and Burak through Affiliated Healthcare.

236.    Affiliated Healthcare and Burak's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

237.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Affiliated Healthcare and Burak**
**(Unjust Enrichment)**

238.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-205, above.

239.    As set forth above, Affiliated Healthcare and Burak have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

240.    When GEICO paid the bills and charges submitted or caused to be submitted by Affiliated Healthcare and Burak through Affiliated Healthcare, it reasonably believed that it was

legally obligated to make such payments based on Affiliated Healthcare and Burak's improper, unlawful, and/or unjust acts.

241.     Affiliated Healthcare and Burak have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Affiliated Healthcare and Burak voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

242.     Affiliated Healthcare and Burak's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

243.     By reason of the above, Affiliated Healthcare and Burak have been unjustly enriched in an amount to be determined at trial, but in no event less than $6,000,000.00.

## **JURY DEMAND**

244.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Affiliated Healthcare,  a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Affiliated Healthcare has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Burak compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $6,000,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Affiliated Healthcare and Burak compensatory damages in an amount to be determined at trial but in excess of $6,000,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

D.      On the Fourth Cause of Action against Affiliated Healthcare and Burak, compensatory damages in an amount to be determined at trial but in excess of $6,000,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against Affiliated Healthcare and Burak, more than $6,000,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: January 31, 2024

                                        _/s/ Max Gershenoff_____
                                        Max Gershenoff (FBN 1038855)
                                        John P. Marino (FBN 814539)
                                        Kristen Wenger (FBN 92136)
                                        Lindsey R. Trowell (FBN 678783)
                                        RIVKIN RADLER, LLP
                                        Riverplace Tower
                                        1301 Riverplace Blvd.
                                        Suite 1000
                                        Jacksonville, FL 32207
                                        Phone:  (904) 791-8948
                                        Facsimile:  (904) 598-6225
                                        Max.Gershenoff@rivkin.com
                                        John.Marino@rivkin.com
                                        Kristen.Wenger@rivkin.com
                                        Lindsey.Trowell@rivkin.com
                                        *Counsel for Plaintiffs*

4865-8260-9547, v. 4